1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MAGUIRE INSURANCE AGENCY, INC.
d/b/a PHILADELPHIA INSURANCE
COMPANIES,

Plaintiff,

v.

AMYNTA AGENCY, INC., et al.,

Defendants.

CASE NO. 22-CV-00064-LK

ORDER GRANTING IN PART
AND DENYING IN PART MAY
AND SPICHER'S MOTION TO
COMPEL, GRANTING MAY AND
SPICHER'S MOTION TO STAY,
GRANTING IN PART AND
DENYING IN PART
PHILADELPHIA'S MOTION TO
STAY PROCEEDINGS IN PART,
AND STAYING PROCEEDINGS

This matter comes before the Court on Defendants Stephan May and Christopher Spicher's

Motion to Compel Arbitration, Dkt. No. 59, and Motion to Stay Proceedings Pending Arbitration,

Dkt. No. 19. Also before the Court is Plaintiff Philadelphia Insurance Companies' Motion to Stay

Proceedings in Part. Dkt. No. 76. Having reviewed the parties' pleadings, the record, and the

governing law, the Court grants in part and denies in part May and Spicher's motion to compel,

grants May and Spicher's motion to stay proceedings pending arbitration, and grants in part and

denies in part Philadelphia's motion to stay proceedings in part.

ORDER GRANTING IN PART AND DENYING IN PART MAY AND SPICHER'S MOTION TO COMPEL,
GRANTING MAY AND SPICHER'S MOTION TO STAY, GRANTING IN PART AND DENYING IN PART
PHILADELPHIA'S MOTION TO STAY PROCEEDINGS IN PART, AND STAYING PROCEEDINGS - 1

# I.  BACKGROUND AND PROCEDURAL HISTORY

Philadelphia Insurance Companies ("Philadelphia") designs, markets, and underwrites commercial property insurance products and surety bonds. Dkt. No. 1 at 5. In April 2015, Philadelphia hired Stephan May to serve as Vice President of its Commercial Surety Division. *Id.* at 6. Christopher Spicher contemporaneously joined Philadelphia as a Senior Specialty Underwriter and was later promoted to Surety Underwriting Manager. *Id.* Both worked at Philadelphia's offices in Seattle, Washington. Dkt. No. 26 at 2; Dkt. No. No. 59 at 6. Spicher reported directly to May and, according to Philadelphia, was his "right-hand man." Dkt. No. 1 at 7; Dkt. No. 8-2 at 7. May's commercial surety team was responsible for 35% of Philadelphia's annual commercial surety business revenue for 2020, and was responsible for Philadelphia's "entire Northwest, Mountain, Central, North Central, and the Ohio Valley West commercial surety business." Dkt. No. 1 at 8.

May and Spicher both executed Philadelphia's Confidentiality and Noncompetition Agreement (the "Noncompete Agreement") as a condition of their employment. *See* Dkt. No. 13-1; Dkt. No. 13-2. In relevant part, they promised not to solicit—for 12 months following their termination from Philadelphia—any current or prospective Philadelphia "agent, broker, insured, policyholder, customer, account, or any lead" that they serviced or learned of during the two years preceding termination "for purposes of inviting or encouraging" the business contact to "transfer its business, business relationship, or patronage" from Philadelphia to a new employer or third party. Dkt. No. 13-1 at 2–3; Dkt. No. 13-2 at 2–3.[1] They also agreed not to directly or indirectly

---

[1] Importantly, if an employee was "not terminated for Cause," this provision permitted departing employees to (1) "continue their relationship with the agencies identified in Exhibit A"—an exhibit listing the employee's preexisting agency contacts, and to (2) "directly or indirectly solicit any surety accounts that Employee maintained a relationship with through such agencies prior to becoming employed with Company," with the exception of surety accounts "for which [Philadelphia] issues bonds, instruments of guarantee or other surety obligations during Employee's term with [Philadelphia]." Dkt. No. 13-1 at 3; Dkt. No. 13-2 at 3. May's and Spicher's Noncompete Agreements each contain a lengthy Exhibit A. Dkt. No. 13-1 at 6–77; Dkt. No. 13-2 at 6–77.

ORDER GRANTING IN PART AND DENYING IN PART MAY AND SPICHER'S MOTION TO COMPEL, GRANTING MAY AND SPICHER'S MOTION TO STAY, GRANTING IN PART AND DENYING IN PART PHILADELPHIA'S MOTION TO STAY PROCEEDINGS IN PART, AND STAYING PROCEEDINGS - 2

"solicit, aid or induce," either individually or on behalf of any other person or entity, any

Philadelphia employee to leave Philadelphia, or "take any action to materially assist or aid" any

other person or entity "in identifying, hiring, or soliciting any such employee[.]" Dkt. No. 13-1 at

3; Dkt. No. 13-2 at 3. They signed another contract, too: the Mutual Dispute Resolution Agreement

and Waiver of Jury Trial (the "MDR Agreement"), which expressly incorporates the Mutual

Dispute Resolution Program – Binding Arbitration, Waiver of Jury Trial, and Collective Actions

(the "Program"). Dkt. No. 60 at 5–8, 10–13; Dkt. No. 61 at 5–8. A handful of provisions from

these latter two documents form the basis of the parties' current dispute.

       First, the MDR Agreement generally requires the parties to arbitrate all disputes arising out

of May and Spicher's employment:

> Applicant and the Employer agree to resolve any and all claims, disputes or
> controversies arising out of or relating to Applicant's . . . employment and/or
> cessation of employment (other than, if applicable, unfair competition claims as
> defined below), through final and binding arbitration, pursuant [to the] Federal
> Arbitration Act ("FAA") conducted by the American Arbitration Association (the
> "AAA") pursuant to [the] Mutual Dispute Resolution Program – Binding
> Arbitration, Waiver of Jury Trial, and Collective Actions (the "Program") and the
> Maguire Insurance Agency Inc. Dispute Resolution Rules and Procedures dated
> January 1, 2015, as amended from time to time (the "Maguire Dispute Resolution
> Rules"), which are attached to this Agreement and incorporated herein by reference.
> To the extent not otherwise provided in the Program or The Maguire Dispute
> Resolution Rules, the arbitration shall be conducted in accordance with and
> governed by the [American] Arbitration Association ("AAA") Employment
> Arbitration Rules and Mediation Procedures ("AAA Rules"). The AAA
> Employment Arbitration Rules can be obtained online at www.adr.org, by calling
> 1-800-778-7879, or upon request to the Employer.

Dkt. No. 60 at 5; Dkt. No. 61 at 5.[2] The MDR Agreement also lists several types of claims that are

---

[2] May and Spicher claim that they do not possess any record of the Maguire Dispute Resolution Rules, and "it seems likely that no such document has existed since the time the Arbitration Agreements were signed." Dkt. No. 59 at 15. May and Spicher characterize this as one of Philadelphia's many "drafting errors and inconsistencies[.]" *Id.* at 16. Philadelphia does not counter these assertions or otherwise mention the Maguire Dispute Resolution Rules anywhere in its opposition brief. However, the MDR Agreement contains the following acknowledgement directly above the signature lines and in all capital letters: "Applicant acknowledges that he/she has had an opportunity to fully read and understand this entire Agreement, the Policy, and the Maguire Dispute Resolution Rules. . . . Applicant's signature

ORDER GRANTING IN PART AND DENYING IN PART MAY AND SPICHER'S MOTION TO COMPEL, GRANTING MAY AND SPICHER'S MOTION TO STAY, GRANTING IN PART AND DENYING IN PART PHILADELPHIA'S MOTION TO STAY PROCEEDINGS IN PART, AND STAYING PROCEEDINGS - 3

"[e]mployment-related disputes or claims" and therefore subject to arbitration, including "claims

under federal, state and local statutory or common law," "contract and tort claims" and claims

against any employee "that arise out of or relate to their actions on behalf of [Philadelphia]." Dkt.

No. 60 at 5; Dkt. No. 61 at 5. As the above provision makes clear, though, the parties carved out

an exception to arbitration for "unfair competition claims." The MDR Agreement goes on to define

such claims as those requiring interpretation, application, or enforcement of the Noncompete

Agreement:

> If and only if the Applicant enters into a written confidentiality, intellectual property, nonsolicitation or noncompetition agreement with [Philadelphia], the following claims for equitable relief – including, without limitation, claims for declaratory or injunctive relief – shall not be subject to arbitration, but may be resolved in court: (1) claims to interpret, apply, or enforce the confidentiality, intellectual property, nonsolicitation or noncompetition provisions of the agreement(s) at issue; or (2) claims regarding the possession, use, dissemination, disclosure of or reliance on information alleged to be confidential, including common law or statutory claims for unfair competition and misappropriation of trade secrets. The claims for equitable relief described in this paragraph are all and singularly referred to as "claims for unfair competition."

Dkt. No. 60 at 6; Dkt. No. 61 at 6.

The Program more or less echoes the MDR Agreement in form and substance. It too

requires employees and applicants to "resolve all of their employment-related disputes or claims

. . . through final and binding arbitration." Dkt. No. 60 at 10. And it too exempts from arbitration

"[c]laims for unfair competition" because those "are not covered by th[e] Program and are not

considered employment-related disputes or claims within the meaning of th[e] Program." *Id.*[3] The

American Arbitration Association Rules (the "AAA Rules") are likewise heavily featured in the

Program, which repeatedly makes clear that such rules control to the extent not otherwise provided

---

below certifies, that Applicant has read, understands, and voluntarily agrees to the terms of this Agreement, the Program, and the Maguire Dispute Resolution Rules." Dkt. No. 60 at 7; Dkt. No. 61 at 7.

[3] The Program has the same definition of "claims for unfair competition" as the MDR Agreement. *Compare* Dkt. No. 60 at 11, *with id.* at 6.

ORDER GRANTING IN PART AND DENYING IN PART MAY AND SPICHER'S MOTION TO COMPEL, GRANTING MAY AND SPICHER'S MOTION TO STAY, GRANTING IN PART AND DENYING IN PART PHILADELPHIA'S MOTION TO STAY PROCEEDINGS IN PART, AND STAYING PROCEEDINGS - 4

in the now missing Maguire Dispute Resolution Rules. *See id.* at 10 ("To the extent not otherwise provided in the Maguire Dispute Resolution Rules, the arbitration shall be conducted in accordance with and governed by the [American] Arbitration Association ('AAA') Employment Arbitration Rules and Mediation Procedures ('AAA Rules')."); *id.* at 10–11 ("[Philadelphia] shall arbitrate any of [its] employment-related claims against any employee or applicant who is covered under this Program . . . pursuant to the Maguire Dispute Resolution Rules and to the extent not otherwise provided therein, the AAA Rules.").

From August 2021 to October 2021, May and Spicher allegedly orchestrated a mass exodus from Philadelphia to a competitor, Defendant Amynta Agency.[4] Dkt. No. 1 at 2–3, 12–13. Philadelphia claims that for months leading up to the mass departure, May and Spicher sowed discord among the ranks of its Commercial Surety Division and ultimately convinced six other employees to leave for Amynta. *Id.* at 12–16, 19–22. Although May and Spicher announced their resignations from Philadelphia on October 8th and 11th, respectively, Philadelphia sent them letters on October 22nd terminating their employment for cause. *Id.* at 12–13, 23. Philadelphia then sued the purported conspirators and Amynta in the United States District Court for the Eastern District of Pennsylvania for breach of the Noncompete Agreement (May and Spicher); breach of fiduciary duty and duty of loyalty (May and Spicher); tortious interference with contractual relations (Amynta); aiding and abetting breach of fiduciary duty and duty of loyalty (Amynta); unfair competition (Amynta); and, finally, declaratory judgment (May and Spicher). *Id.* at 25–34. Philadelphia also moved for expedited discovery, Dkt. No. 9, and for a preliminary injunction "to enforce the valid restrictive covenants to which May and Spicher agreed in their Confidentiality and Noncompetition Agreements . . . and [to] stop further breaches of those Agreements, Amynta's

---

[4] Amynta Agency and Defendant PDP Group Incorporated d/b/a Amynta Surety Solutions are referred to collectively herein as "Amynta."

tortious interference with the Agreements, and Amynta's unfair competition." Dkt. No. 8-2 at 7.

Although May and Spicher chide Philadelphia for filing suit in the Eastern District of Pennsylvania, Dkt. No. 59 at 7, their dismissive criticism belies the complexity of the venue issue. The parties litigated this issue before Judge Brody after May and Spicher filed both a Motion to Stay and a Motion to Compel Arbitration or, Alternatively, Dismiss for Improper Venue. Dkt. No. 19; Dkt. No. 26. Amynta likewise filed a Motion to Dismiss for Improper Venue. Dkt. No. 27. Judge Brody originally denied both motions to dismiss, Dkt. No. 35 at 1, but then reversed course and granted them as motions to transfer,[5] Dkt. No. 36 at 2, 15; Dkt. No. 37 at 1. Judge Brody reserved for this Court a decision on May and Spicher's Motion to Compel Arbitration. Dkt. No. 37 at 1; *see also* Dkt. No. 36 at 5 n.1. She also left intact their Motion to Stay, Dkt. No. 19-2, and Philadelphia's Motion for Preliminary Injunction, Dkt. No. 8. *See* Dkt. No. 36 at 15.

After the case was transferred to this district, May and Spicher renewed their Motion to Compel Arbitration. Dkt. No. 59. Philadelphia then filed a Motion to Supplement Briefing and Record for Preliminary Injunction Motion. Dkt. No. 64. In December 2022, however, Philadelphia withdrew that motion and its Motion for Preliminary Injunction, due to "the passage of time" since filing those motions. Dkt. No. 75 at 2. Shortly thereafter, Philadelphia filed a Motion to Stay Proceedings in Part, asking the Court to stay its claims against May and Spicher pending arbitration and to allow its claims against Amynta to proceed in this Court. Dkt. No. 76 at 3. May and Spicher oppose the motion, contending that this case should be stayed in its entirety pending arbitration of Philadelphia's claims against them. Dkt. No. 77 at 1–2, 4–6.

---

[5] Judge Brody reasoned that because the forum-selection clause in the Noncompete Agreement is permissive, while the forum-selection clause in the Program is mandatory, the latter controls. Dkt. No. 36 at 13.

ORDER GRANTING IN PART AND DENYING IN PART MAY AND SPICHER'S MOTION TO COMPEL, GRANTING MAY AND SPICHER'S MOTION TO STAY, GRANTING IN PART AND DENYING IN PART PHILADELPHIA'S MOTION TO STAY PROCEEDINGS IN PART, AND STAYING PROCEEDINGS - 6

## II.     DISCUSSION

**A.     Jurisdiction**

Philadelphia correctly asserts that this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Dkt. No. 1 at 5. For purposes of diversity jurisdiction, Philadelphia is a citizen of Pennsylvania, Amynta Agency is a citizen of Delaware and New York, Amynta Surety Solutions is a citizen of Maryland, and both May and Spicher are citizens of Washington. *Id.* at 4–5; Dkt. No. 62 at 4. Philadelphia plausibly alleges that the amount in controversy exceeds $75,000. Dkt. No. 1 at 5; *see also id.* at 8, 13.

**B.     Legal Standard**

Under the Federal Arbitration Act ("FAA"), "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition" the district court for "an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. The FAA further provides that the Court "shall" order arbitration "in accordance with the terms of the agreement" once it is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue[.]" *Id.* Thus, in a motion to compel arbitration, this Court is limited to determining: (1) whether a valid agreement to arbitrate exists, and, if so, (2) whether the agreement encompasses the claim at issue. *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). If the court answers both questions in the affirmative, "then the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms." *Id.* But where the parties have "clearly and unmistakably" delegated questions regarding arbitrability to the arbitrator, the Court need not reach the second inquiry. *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).

Here, the parties do not dispute that their agreement to arbitrate is valid. But they dispute two things: who decides arbitrability, and whether Philadelphia's claims against May and Spicher

ORDER GRANTING IN PART AND DENYING IN PART MAY AND SPICHER'S MOTION TO COMPEL, GRANTING MAY AND SPICHER'S MOTION TO STAY, GRANTING IN PART AND DENYING IN PART PHILADELPHIA'S MOTION TO STAY PROCEEDINGS IN PART, AND STAYING PROCEEDINGS - 7

are arbitrable. May and Spicher maintain that an arbitrator—rather than the Court—must determine which of Philadelphia's claims are arbitrable. Dkt. No. 59 at 7–9, 11, 15–16. And, in any event, they contend that those claims are in fact arbitrable under the MDR Agreement and the Program. *Id.* at 7–8, 11–13. Philadelphia disagrees on both fronts. In its view, the parties did not clearly and unmistakably agree to delegate the arbitrability determination to the arbitrator. Dkt. No. 67 at 15–18. Likewise, Philadelphia argues that its claims against May and Spicher are for unfair competition and therefore fall squarely within the carve-out provision exempting them from mandatory arbitration. *Id.* at 11–14. The Court addresses these issues in turn, beginning with whether the parties agreed to arbitrate arbitrability.

**C.     The Parties Did Not Clearly and Unmistakably Agree to Arbitrate Arbitrability**

Because "arbitration is a matter of contract," arbitration agreements must be enforced "according to their terms." *Rent-A-Center., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010). "[P]arties may agree to have an arbitrator decide not only the merits of a particular dispute but also 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (cleaned up). And when parties have agreed to arbitrate "arbitrability," a court may not disregard their agreement—even if a particular argument for arbitration seems to be "wholly groundless." *Id.* at 529–31.

Usually, courts look to state law to interpret arbitration agreements. *See, e.g.*, *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1414–15 (2019).[6] But for questions of "arbitrability," the Supreme Court has adopted an additional interpretive rule: there must be "clear and unmistakable" evidence that the parties agreed to have an arbitrator decide such issues. *First Options of Chi., Inc. v. Kaplan*,

---

[6] The parties do not address whether Washington or Pennsylvania law applies, although Philadelphia seems to suggest in passing that Washington law applies. *See* Dkt. No. 67 at 12.

ORDER GRANTING IN PART AND DENYING IN PART MAY AND SPICHER'S MOTION TO COMPEL, GRANTING MAY AND SPICHER'S MOTION TO STAY, GRANTING IN PART AND DENYING IN PART PHILADELPHIA'S MOTION TO STAY PROCEEDINGS IN PART, AND STAYING PROCEEDINGS - 8

514 U.S. 938, 944 (1995) (cleaned up); *see also Rent-A-Center*, 561 U.S. at 69 n.1 (describing this "heightened standard"). In effect, this rule reverses the usual presumption in favor of arbitration when it comes to questions of "arbitrability." *See Kaplan*, 514 U.S. at 944–45; *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013) ("In other words, there is a presumption that courts will decide which issues are arbitrable; the federal policy in favor of arbitration does not extend to deciding questions of arbitrability.").

The Ninth Circuit has held that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Brennan*, 796 F.3d at 1130; *G.G. v. Valve Corp.*, 799 Fed. App'x. 557, 558 (9th Cir. 2020). That is because Rule 6(a) of the AAA rules vests the arbitrator with "the power to rule on his or her own jurisdiction[.]" Am. Arb. Ass'n, *Employment Arbitration Rules and Mediation Procedures* 12 (2009), https://www.adr.org/sites/default/files/EmploymentRules_Web_2.pdf.

Here, three agreements are in play: the MDR Agreements, the Program, and the Noncompete Agreements. As noted above, the MDR Agreements and Program expressly incorporate the AAA Rules. *See* Dkt. No. 60 at 5, 10–12. And Philadelphia does not contest the validity or enforceability of those delegation provisions. *See Rent-A-Center*, 561 U.S. at 71; *Brennan*, 796 F.3d at 1133. That is the end of the matter according to May and Spicher. In their view, "the AAA Rules govern without limitation" because "[n]othing within the Arbitration Agreements or Arbitration Program indicates any intent to deviate from the AAA Rules." Dkt. No. 59 at 16. Philadelphia, on the other hand, counters that the parties' carve-out provision "appl[ies] to *both* the scope of arbitration and delegation of the issue of arbitrability[.]" Dkt. No. 67 at 16 (emphasis in original). It argues that the language of these agreements "indicates that the parties did not intend to delegate to the arbitrator the arbitrability with regard to claims for 'unfair competition' (as defined) and equitable relief." *Id.* at 17 ("The Dispute Resolution Agreements

provide, '*To the extent not otherwise provided in the Program*..., the arbitration shall be conducted in accordance with and governed by the Arbitration Association ('AAA') Employment Arbitration Rules and Mediation Procedures ('AAA Rules').").

The three agreements at issue do not evince a clear and unmistakable intent to delegate the arbitrability determination to the arbitrator. And nothing in the Ninth Circuit's jurisprudence suggests that talismanic incorporation of the AAA Rules creates an unqualified delegation of the arbitrability determination, even in the midst of limiting language. Indeed, and consistent with basic principles of contract law, the Ninth Circuit has made clear that parties are free to limit their delegation to specific issues. *See Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1209 (9th Cir. 2016) ("The delegation provisions clearly and unmistakably delegated the question of arbitrability to the arbitrator for all claims except challenges to the class, collective, and representative action waivers[.]"). The parties here did just that.

It is "a basic principle of contract law that two or more agreements executed at the same time by the same parties as a part of the same transaction should be construed together as one contract." *Union Pac. R. Co. v. Chicago M. St. P. & P. R. Co.*, 549 F.2d 114, 117 (9th Cir. 1976); *see also* Dkt. No. 36 at 11; *Moore v. Moore*, 25 A.2d 130, 131 (Pa. 1942); *Mead v. Anton*, 207 P.2d 227, 234 (Wash. 1949). The MDR Agreements and the Program were executed on February 12, 2015 (May) and February 23, 2015 (Spicher), and the Noncompete Agreements were executed on February 23, 2015. Dkt. No. 13-1 at 5; Dkt. No. 13-2 at 5; Dkt. No. 60 at 5, 8; Dkt. No. 61 at 5, 8. Because they were effectively simultaneously executed as part of the same transaction, the Court construes them together.

The Noncompete Agreements make no mention of arbitration. They provide that "the validity, construction, interpretation or performance of this [Agreement] shall be governed by the laws of the Commonwealth of Pennsylvania and the parties hereby irrevocably consent to the

jurisdiction of the United States District Court for the Eastern District of Pennsylvania." Dkt. No. 13-1 at 4; Dkt. No. 13-2 at 4. These agreements state that they are the "entire understanding of the parties" and "may not be modified in any way except in writing and with the mutual consent of Employee and Company." Dkt. No. 13-2 at 4.[7] They make no reference to the MDR Agreements or the Program, and they "supersede[] and replace[] any prior agreement of employment, confidentiality, nondisclosure, noncompetition, or nonsolicitation with Company," except that "the requirements of any other policy regarding Confidential Information . . . shall remain in full force and effect as a supplement but not a replacement of th[ese] Agreement[s]." Dkt. No. 13-1 at 4; Dkt. No. 13-2 at 4.

The MDR Agreements and Program make no mention of modifying the Noncompete Agreements.[8] Indeed, it appears that the parties did not intend that the MDR Agreements and Program do so, as they contain carve-outs exempting from arbitration "claims to interpret, apply or enforce the . . . nonsolicitation or noncompetition provisions of the *agreement(s)* at issue." Dkt. No. 60 at 6 (emphasis added); *id.* at 11. Importantly, the MDR Agreements indicate that, among the three agreements, the provisions governing arbitration are in the Program: "To the extent not otherwise provided in the Program . . . the arbitration shall be conducted in accordance with and governed by the . . . []AAA Rules[]." Dkt. No. 60 at 5; Dkt. No. 61 at 5. And the Program itself supports that interpretation: unlike the MDR Agreement, it references arbitration in its title, and

---

[7] May's Noncompete Agreement appears to be missing a line; it does not contain the following bolded text:

> This Agreement constitutes the entire understanding of the parties and it may not be modified or amended in any way except in writing and with the mutual consent of **Employee and Company. This Agreement supersedes and replaces any prior agreement of** employment, confidentiality, nondisclosure, noncompetition, or nonsolicitation with Company.

*Compare* Dkt. No. 13-2 at 4, *with* Dkt. No. 13-1 at 4.

[8] No party argues that the Noncompete Agreements supersede or replace the MDR Agreements or Program.

its provisions detail Philadelphia's arbitration requirements.[9] Again, both the Program and MDR Agreement contain carve-outs for unfair competition claims.

Specifically, the Program states that it does not apply to "[c]laims for unfair competition," which "are not covered by this Program and are not considered employment-related disputes or claims within the meaning of this Program." Dkt. No. 60 at 10. Accordingly, the provisions in the Program referring to "employment-related disputes"—and the AAA Rules that govern them—do not apply to unfair competition claims:

- By continuing their employment, "employees agree to resolve all *employment-related disputes or claims* . . . through final and binding arbitration, pursuant to the . . . Maguire Dispute Resolution Rules" and "[t]o the extent not otherwise provided in the . . . Rules, the arbitration shall be conducted in accordance with and governed by the [AAA Rules]." *Id.* at 10 (emphasis added).

- "[Philadelphia] shall arbitrate any of [its] *employment-related claims* against any employee or applicant who is covered under this Program . . . pursuant to the Maguire Dispute Resolution Rules and to the extent not otherwise provided therein, the AAA Rules." *Id.* at 10–11 (emphasis added).

- Philadelphia agrees that "final and binding arbitration" will be the sole and exclusive remedy for claims "covered under this Program[.]" *Id.* at 11.

The MDR Agreements similarly provide that the parties must arbitrate "any and all claims, disputes or controversies arising out of or relating to Applicant's . . . employment and/or cessation of employment (other than . . . unfair competition claims . . .) pursuant [to the FAA] conducted by the [AAA] pursuant to . . . the []Program[.]" Dkt. No. 60 at 5; Dkt. No. 61 at 5. But pursuant to the Program, "[c]laims for unfair competition . . . are not covered . . . and are not considered employment-related disputes or claims[.]" Dkt. No. 60 at 10. Accordingly, the next sentence in the MDR Program—providing that "[t]o the extent not otherwise provided in the Program[,] . . . the arbitration shall be conducted in accordance with and governed by the [AAA Rules]"—expressly

---

[9] The Employee Handbook likewise refers to the Program as the document governing arbitration. Dkt. No. 60 at 16; Dkt. No. 61 at 11.

ORDER GRANTING IN PART AND DENYING IN PART MAY AND SPICHER'S MOTION TO COMPEL, GRANTING MAY AND SPICHER'S MOTION TO STAY, GRANTING IN PART AND DENYING IN PART PHILADELPHIA'S MOTION TO STAY PROCEEDINGS IN PART, AND STAYING PROCEEDINGS - 12

qualifies application of the AAA Rules and, by extension, Rule 6(a)'s jurisdictional-arbitrability delegation. Dkt. No. 60 at 5; Dkt. No. 61 at 5.

Other content in the three agreements supports this conclusion. For example, the Program contains a section titled "Procedure for Arbitration." Dkt. No. 60 at 11. That section provides guidance for prospective plaintiffs regarding, among other things, the procedure for initiating the arbitration process, payment of and responsibility for the filing fee and arbitrator's fee, the location of the arbitration, and the selection of an arbitrator pursuant to the AAA Rules. *Id*. at 11–12. Such guidance would be relevant to a plaintiff with an unfair competition claim if an arbitrator were supposed to handle the "gateway issue" of arbitrability, but again, the Program expressly disclaims application to such claims. Furthermore, while the Program requires a plaintiff to "complete a[n] AAA Employment Arbitration Rules Demand for Arbitration Form" and send it to the AAA to invoke arbitration, *id.* at 11–12, the MDR Agreement indicates that a plaintiff may "file a lawsuit in court" if the claim at issue is an unfair competition claim. *Id.* at 7 ("Applicant will be required to arbitrate any and all employment related claims he/she may have against the Employer . . . and Applicant may not file a lawsuit in court concerning such claims . . . (other than . . . unfair competition claims . . . .)."); Dkt. No. 61 at 7 (same).

In a case involving somewhat weaker facts, *Archer & White Sales, Inc. v. Henry Schein, Inc.*, 935 F.3d 274 (2019) ("*Schein II*"), the Fifth Circuit concluded that it was for the court—not the arbitrator—to determine arbitrability. That case also involved a carve-out provision: the parties agreed that "[a]ny dispute arising under or related to this Agreement (except for actions seeking injunctive relief and disputes related to trademarks, trade secrets, or other intellectual property . . . ), shall be resolved by binding arbitration in accordance with the arbitration rules of the American Arbitration Association." 935 F.3d at 280 (cleaned up). The court found the placement of the carve-out provision "dispositive" because the "most natural reading of the

arbitration clause" was that "any dispute, except actions seeking injunctive relief, shall be resolved in arbitration in accordance with the AAA Rules." *Id.* at 281. Here, too, the "plain language" of the parties' agreements "incorporates the AAA rules—and therefore delegates arbitrability—for all disputes *except* those under the carve-out." *Id.* (emphasis in original). And like the *Schein II* court, the Court here cannot say that either the MDR Agreement or the Program "evinces a 'clear and unmistakable' intent to delegate arbitrability." *Id.* at 281–82; *see also Han v. Synergy Homecare Franchising, LLC*, No. 16-CV-03759-KAW, 2017 WL 446881, at *5–6 (C.D. Cal. Feb. 2, 2017) (parties did not clearly and unmistakably delegate arbitrability with respect to claims excluded by the carve-out provision).

The Ninth Circuit's decision in *Oracle America* does not alter this result. That case also involved a carve-out provision:

> Any dispute arising out of or relating to this [Source] License shall be finally settled by arbitration as set out herein, except that either party may bring any action, in a court of competent jurisdiction (which jurisdiction shall be exclusive), with respect to any dispute relating to such party's Intellectual Property Rights or with respect to Your compliance with the TCK license. Arbitration shall be administered: (i) by the American Arbitration Association (AAA), (ii) in accordance with the rules of the United Nations Commission on International Trade Law (UNCITRAL) (the "Rules") in effect at the time of arbitration as modified herein[.]

724 F.3d at 1071.[10] Oracle, the party resisting arbitration, argued that the arbitrability determination with respect to intellectual property claims or claims arising out of the TCK License were "disputes relating to" those claims, and therefore fell within the district court's exclusive jurisdiction. *Id.* at 1075–76 The Ninth Circuit disagreed. As the court explained, Oracle's argument "conflate[d] the *scope* of the arbitration clause, *i.e.*, which claims fall within the carve-out

---

[10] Like the AAA Rules—specifically, Rule 6(a)—the UNCITRAL Rules delegate to the arbitral tribunal the power to rule on its own jurisdiction. *See Oracle Am.*, 724 F.3d at 1073. Because *Oracle America* involved the UNCITRAL Rules, it was not until *Brennan* that "the question regarding incorporation of the AAA rules [came] squarely before" the Ninth Circuit. *Brennan*, 796 F.3d at 1130.

ORDER GRANTING IN PART AND DENYING IN PART MAY AND SPICHER'S MOTION TO COMPEL, GRANTING MAY AND SPICHER'S MOTION TO STAY, GRANTING IN PART AND DENYING IN PART PHILADELPHIA'S MOTION TO STAY PROCEEDINGS IN PART, AND STAYING PROCEEDINGS - 14

provision, with the question of *who* decides arbitrability." *Id.* at 1076. The court went on to emphasize the distinction: "The decision that a claim relates to intellectual property rights or compliance with the TCK License constitutes an arbitrability determination, which the parties have clearly and unmistakably delegated to the arbitrator by incorporating the UNCITRAL rules." *Id.*

Although enticing at first blush, the arbitration provision and carve-out in *Oracle America* involved a circularity that sets them apart from those at issue here. The claims exempted from arbitration under the *Oracle America* carve-out clause "by definition" arose out of or were related to the Source License, and the agreement expressly stated that claims arising out of the Source License had to be settled by arbitration. *See* 724 F.3d at 1076. The issue with the *Oracle America* carve-out provision, then, was that the two categories of exempted claims—disputes relating to intellectual property and the TCK License—"by definition were claims arising out of or relating to the Source License, which were explicitly subject to arbitration." *Schein II*, 935 F.3d at 281 n.30.

Here, no such circularity exists. The parties expressly excluded unfair competition claims from the "employment-related claims" subject to the AAA Rules. And the structure and content of the three agreements in play buttress the parties' intent to treat unfair competition claims as a separate category subject only to litigation in court. Had the parties wished to wholesale delegate arbitrability to the arbitrator, they would have done so. *See Han*, 2017 WL 446881, at *6. The Court will not "override" or re-write their contract. *Henry Schein*, 139 S. Ct. at 529; *see also AT&T Mob. LLC v. Concepcion*, 563 U.S. 333, 339 (2011) ("[C]ourts must place arbitration agreements on an equal footing with other contracts and enforce them according to their terms." (internal citations omitted)). The Court now turns to the second issue: whether Philadelphia's claims against May and Spicher are arbitrable.

**D.      One of Philadelphia's Claims Against May and Spicher Is Arbitrable; Two Are Not**

May and Spicher contend that Philadelphia's claims against them (Counts I, II, and VI) are arbitrable under the MDR Agreement and Program because they arise out of and are related to their employment. Dkt. No. 59 at 11–12. They appear to further claim that, because Philadelphia seeks monetary damages, its claims are not "claims for equitable relief" and therefore fall outside the scope of the carve-out provision. *See id.* at 12–13. Although these arguments are meritless, the Court finds that Count II of Philadelphia's complaint is arbitrable. Counts I and VI, however, are not.

Federal policy favors arbitration, and the Court resolves any ambiguities regarding the scope of arbitrable issues in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1019 (9th Cir. 2016). At the same time, arbitration "is strictly a matter of consent, and thus is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration." *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 299 (2010) (cleaned up) (emphasis in original). The Supreme Court has repeatedly warned that the FAA does not "prevent parties who do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement[.]" *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989). Thus, to determine whether an issue falls within the scope of the parties' arbitration agreement, the Court looks to state contract law while giving due regard to the federal policy favoring arbitration. *Kaplan*, 514 U.S. at 944; *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014).

Under the MDR Agreements, the parties must arbitrate "any and all claims, disputes or controversies arising out of or relating to [May and Spicher's] . . . employment and/or cessation of employment" with the exception of "unfair competition claims" as defined therein. Dkt. No. 60 at

ORDER GRANTING IN PART AND DENYING IN PART MAY AND SPICHER'S MOTION TO COMPEL, GRANTING MAY AND SPICHER'S MOTION TO STAY, GRANTING IN PART AND DENYING IN PART PHILADELPHIA'S MOTION TO STAY PROCEEDINGS IN PART, AND STAYING PROCEEDINGS - 16

5; Dkt. No. 61 at 5. The Program similarly mandates arbitration for employment-related disputes, but it too expressly exempts claims for unfair competition: "Claims for unfair competition . . . are not covered by this Program and are not considered employment-related disputes or claims within the meaning of this Program." Dkt. No. 60 at 10. May and Spicher's suggestion that Philadelphia's claims are arbitrable simply because they arise out of or are related to their employment thus ignores the carve-out provision. The Court need not dwell on that argument any longer.

Next, the MDR Agreement and Program include identical definitions for "claims for unfair competition." Both define that term as encompassing "claims to interpret, apply or enforce the confidentiality, intellectual property, nonsolicitation or noncompetition provisions of the agreement(s) at issue," as well as "claims regarding the possession, use, dissemination, disclosure of or reliance on information alleged to be confidential," which in turn includes "common law or statutory claims for unfair competition and misappropriation of trade secrets." *Id.* at 6, 11. The carve-out applies to such claims "including, without limitation," when they seek "equitable relief" such as "declaratory or injunctive relief[.]" *Id*. The Court has little difficulty concluding that Counts I and VI fall squarely within the plain and unambiguous language of this carve-out provision. This is so regardless of whether Washington or Pennsylvania law applies. *See Ley v. Clark Cnty. Pub. Transp. Benefit Area*, 386 P.3d 1128, 1133 (Wash. Ct. App. 2016) ("If the contract language is clear and unambiguous, we must enforce the contract as written."); *E.R. Linde Constr. Corp. v. Goodwin*, 68 A.3d 346, 349 (Pa. Super. Ct. 2013) ("Where the language of the contract is clear and unambiguous, a court is required to give effect to that language.").

Count I alleges that May and Spicher "breached their obligations" under the Noncompete Agreement by "encouraging Philadelphia['s] employees to leave Philadelphia [] and/or to join Amynta, soliciting and recruiting Philadelphia['s] employees to Amynta, and/or aiding Amynta in seeking to recruit and/or hire Philadelphia['s] employees[.]" Dkt. No. 1 at 25–26. This is a claim

"to interpret, apply [and] enforce" the terms of the Noncompete Agreement and is therefore exempted from arbitration. Dkt. No. 60 at 6; Dkt. No. 61 at 6. Count VI likewise falls within the plain language of the carve-out provision. The declaratory judgment that Philadelphia seeks entails the interpretation, application, and enforcement of the Noncompete Agreement:

> [A] declaratory judgment will terminate the controversy surrounding whether Defendants May and Spicher were terminated for '[c]ause' under their respective Confidentiality and Noncompetition Agreements and are prohibited, in relevant part and without limitation, from soliciting any current or prospective agent, broker, insured, policyholder, customer, account, or any lead derived from Philadelphia [] who they serviced or whose name became known to them during the two (2) years preceding termination of [their] employment for a period of twelve (12) months.

Dkt. No. 1 at 32; *see also id.* at 34 (requesting declaratory judgment that May and Spicher "violated the terms of their respective Confidentiality and Noncompetition Agreements").

Count II, which alleges breach of fiduciary duty and the duty of loyalty, is a different story. Dkt. No. 1 at 26–28. The plain language of the carve-out provision is again dispositive. A common-law tort action for breach of fiduciary duty and the duty of loyalty is not a "claim[] to interpret, apply or enforce the confidentiality, intellectual property, nonsolicitation or noncompetition provisions of the [parties'] agreement(s)[.]" Dkt. No. 60 at 6; Dkt. No. 61 at 6. Nor is it a "claim[] regarding the possession, use, dissemination, disclosure of or reliance on information alleged to be confidential," a category that includes "common law or statutory claims for unfair competition and misappropriation of trade secrets." Dkt. No. 60 at 6; Dkt. No. 61 at 6. The parties must therefore arbitrate this claim. Both the plain language of their agreements and the strong federal policy in favor of arbitration compel this result. *See Goldman, Sachs & Co.*, 747 F.3d at 742.[11] May and Spicher's motion to compel arbitration is granted in part and denied in part.

---

[11] Philadelphia has apparently agreed to arbitrate its claims against May and Spicher. Dkt. No. 76 at 3. The parties are of course free to stipulate to the arbitration of any and all claims—including those claims not subject to mandatory arbitration under the parties' agreements.

ORDER GRANTING IN PART AND DENYING IN PART MAY AND SPICHER'S MOTION TO COMPEL, GRANTING MAY AND SPICHER'S MOTION TO STAY, GRANTING IN PART AND DENYING IN PART PHILADELPHIA'S MOTION TO STAY PROCEEDINGS IN PART, AND STAYING PROCEEDINGS - 18

**E.      The Court Stays These Proceedings Pending Arbitration on Count II**

May and Spicher urge the Court to stay this case in its entirety "even if certain claims against May and Spicher [are] not . . . subject to arbitration" and "even though Amynta is not a party to the arbitration agreement." Dkt. No. 59 at 13–14; *see also* Dkt. No. 19-2 at 11–12. Philadelphia contends that a wholesale stay is inappropriate in this case because the nonarbitrable claims predominate. Dkt. No. 67 at 13 (citing *United Commc'ns Hub, Inc. v. Qwest Commc'ns, Inc.*, 46 Fed. App'x 412, 415 (9th Cir. 2002)); Dkt. No. 29 at 10–12; *see also* Dkt. No. 79-1 at 3–8 (arguing that the case should not be stayed as to Amynta).

The FAA mandates that the Court stay an action "where [it] is brought by a signatory to an arbitration agreement against another signatory to that agreement, on claims subject to that agreement." *Ballard v. Corinthian Colls., Inc.*, No. C06-5256-FDB, 2006 WL 2380668, at *2 (W.D. Wash. Aug. 16, 2006); *see* 9 U.S.C. § 3. But it is in the Court's discretion "whether to stay, for considerations of economy and efficiency, an entire action, including issues not arbitrable, pending arbitration." *Kater v. Churchill Downs Inc.*, No. C15-612-RBL, 2019 WL 3944323, at *1 (W.D. Wash. Aug. 21, 2019) (cleaned up); *Winfrey v. Kmart Corp.*, 692 F. App'x 356, 357 (9th Cir. 2017) ("A party is only *entitled* to a stay pursuant to section 3 [of the FAA] as to arbitrable claims or issues," but "[a]s to nonarbitrable claims and issues, . . . the district court has discretion whether to stay the litigation pending arbitration." (cleaned up)). The Court's discretion extends to nonarbitrable claims against a nonsignatory defendant like Amynta. *See Moses H. Cone*, 460 U.S. at 20 n.23.

Philadelphia correctly notes that staying nonarbitrable claims is generally appropriate only when "the arbitrable claims predominate, or where the outcome of the nonarbitrable claims will depend upon the arbitrator's decision." Dkt. No. 67 at 13 (quoting *United Communications*, 46 Fed. App'x at 415). The fact that five of Philadelphia's six claims are nonarbitrable certainly

weighs against a wholesale stay in this case. That, however, is only part of the calculus. As noted, the Court considers whether any nonarbitrable claims depend on the arbitrator's resolution of the arbitrable claim, *i.e.*, Philadelphia's common-law claim for breach of fiduciary duty and duty of loyalty. *See U.S. for Use & Benefit of Newton v. Neumann Caribbean Int'l, Ltd.*, 750 F.2d 1422, 1427 (9th Cir. 1985) (district court did not err in staying nonarbitrable claims because "there were ample reasons for avoiding a duplication of effort in trying simultaneously, or even successively, the issues" and "[c]onsiderations of economy and efficiency fully support[ed] the District Court's determination" that the nonarbitrable claims must await the arbitrator's final determination). Conversely, the Court must consider whether permitting the nonarbitrable claims to go forward might "impair [the] arbitrator's consideration" of Philadelphia's lone arbitrable claim. *Ballard*, 2006 WL 2380668, at *2. Both concerns are present here. Count IV, for example, alleges that Amynta aided and abetted May and Spicher in breaching their fiduciary duty and duty of loyalty. Dkt. No. 1 at 29–31. That claim therefore turns directly on the arbitrator's resolution of Count II: whether May and Spicher breached their fiduciary duty and duty of loyalty in the first place. *Compare id.* at 27, *with id.* at 30. Because Amynta's fate turns on whether May and Spicher breached their common-law fiduciary duties, the claims are intertwined. *See Kater*, 2019 WL 3944323, at *2 (courts "generally grant" stays when "the plaintiff's claims against a non-signatory defendant are intertwined with their arbitrable claims against another defendant").

There is more. The four corners of Philadelphia's complaint make clear that Count II "depends upon the same facts [as] and is inherently inseparable from" the remainder of the arbitrable claims. *Ballard*, 2006 WL 2380668, at *2. A brief review of the allegations supporting Count II shows why. There, Philadelphia contends that May and Spicher breached their fiduciary duty and duty of loyalty by "sowing discontent with Philadelphia [] employees," "expressing negativity about Philadelphia [] . . . to one or more agents," and "scheming to . . . recruit others to

1    leave Philadelphia['s] employment and join them" at Amynta. Dkt. No. 1 at 27. These allegations

2    form the basis of each of Philadelphia's claims. *See* Dkt. No. 1 at 25–26 (Count I, alleging that

3    May and Spicher breached the Noncompete Agreement by "encouraging" Philadelphia employees

4    to join Amynta, "soliciting and recruiting" Philadelphia employees to join Amynta, and "aiding

5    Amynta in seeking to recruit and/or hire" Philadelphia employees); *id.* at 28–29 (Count III,

6    alleging that Amynta "assisted, encouraged, and facilitated May and Spicher to breach their

7    agreements by supporting, encouraging, and/or assisting the unlawful . . . solicitation and

8    recruitment" of Philadelphia employees); *id.* at 29–31 (Count IV, alleging that Amynta "aided and

9    assisted" May and Spicher in breaching their fiduciary duty and duty of loyalty "by assisting them

10   to . . . recruit the [d]eparting [e]mployees to leave" Philadelphia and begin employment with

11   Amynta); *id.* at 31 (Count V, alleging that Amynta "willfully and intentionally recruited an entire

12   team of Philadelphia['s] employees in the Commercial Surety Division to work for Amynta for an

13   improper purpose[.]"); *id.* at 33–34 (Count VI, requesting declaratory judgment that May and

14   Spicher's conduct violated the Noncompete Agreement). The arbitrator's resolution of Count II

15   thus necessarily informs the outcome of the nonarbitrable claims—and vice versa. At the very

16   least, concurrent adjudication of the underlying factual premise would risk inconsistency between

17   the arbitrator's decision and that of the Court. *See Ballard*, 2006 WL 2380668, at *2 ("[G]iven the

18   interdependence of the claims, simultaneous litigation of such claims in separate forums would

19   likely lead to a duplication of effort, as well as the risk of inconsistent decisions and

20   inefficiencies.").

21          Courts typically decline to stay cases when the arbitrable claims have no bearing on the

22   nonarbitrable claims, and when other non-signatory *plaintiffs* will be prejudiced by a stay. *See,*

23   *e.g.*, *Wolfire Games, LLC v. Valve Corp.*, No. C21-0563-JCC, 2021 WL 4952220, at *3 (W.D.

24   Wash. Oct. 25, 2021) (declining to stay case because the non-signatory plaintiff alleged ongoing

harm from the defendant's actions, and "the arbitrator's findings and conclusions on the [signatory] consumers' claims would not bind the Court" in addressing non-signatory plaintiff's claims); *Congdon v. Uber Techs., Inc.*, 226 F. Supp. 3d 983, 990 (N.D. Cal. 2016) (denying stay where arbitration of the non-opt-out plaintiffs' claims had "no bearing" on the court's resolution of the opt-out plaintiffs' claims, despite the fact that some claims "involve[d] the same operative facts"). Here, however, Philadelphia is the sole signatory plaintiff and three of its five nonarbitrable claims are against non-signatory *defendant* Amynta (Counts III, IV, and V). *See Kater*, 2019 WL 3944323, at *2 ("[A] stay is more appropriate when another defendant did not agree to arbitrate but less appropriate when another plaintiff did not."). Moreover, those claims turn on the same factual basis as Philadelphia's arbitrable claim against May and Spicher. The Court stays these proceedings in their entirety pending the outcome of arbitration.

May and Spicher's motion to stay is therefore granted. Philadelphia's motion for a partial stay is granted with respect to its request for an order staying this case while the parties arbitrate its claims against May and Spicher. The motion is denied, however, with respect to Philadelphia's request to permit its claims against Amynta to proceed before arbitration is complete. The motion is also denied with respect to Philadelphia's request for an order denying as moot May and Spicher's motion to compel arbitration, because the parties dispute whether the Court should grant the relief sought. *See, e.g.*, Dkt. No. 59 at 2, 6, 13–14, 16–17 (requesting a stay of the entire case).

## III.   CONCLUSION

The Court GRANTS IN PART and DENIES IN PART May and Spicher's Motion to Compel Arbitration, Dkt. No. 59, GRANTS May and Spicher's Motion to Stay Judicial Proceedings Pending Arbitration, Dkt. No. 19, and GRANTS IN PART and DENIES IN PART Philadelphia's Motion to Stay Proceedings In Part, Dkt. No. 76.

The Court STAYS these proceedings pending arbitration. The parties are DIRECTED to

file a joint status report within ten days of the completion of arbitration proceedings.

Dated this 24th day of January, 2023.

Lauren King
United States District Judge